# EXHIBIT A

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

A. Kevin Fahey
5303 Birds View Lane, Unit D
Alexandria, VA

        Plaintiff,


Apple Inc.
1 Apple Park Way
Cupertino, CA 95014
Defendant

Registered agent in the District of Columbia
CT Corporation System
1015 15th Street, NW
Suite 1000
Washington DC   20005

Civil Action Number   **2020 CA 000325 B**

Jury Trial Demanded

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kevin Fahey ("Plaintiff"), by and through his counsel, brings this action against the defendant named above on behalf of a class of purchasers of the various products sold in the defendant's online store and alleges the following based upon information, belief and the investigation of counsel:

### NATURE OF THE CASE

1. This is a representative action brought on behalf of Plaintiff and a class of purchasers of Defendant's online store, which purchases took place within the District of Columbia

2. The Plaintiff and the class who purchase software applications or license for software

applications from the defendant. The defendant has market power for its mobile smartphones. These mobile smartphones rely heavily on their performance for applications that perform numerous tasks vital to the defendant's ability to charge a premium for the defendant's smartphone products.

3. The defendant makes many of these apps. However, when the defendant first came out with its first mobile smartphone in 2007, other companies began developing apps for its smart phones. These products have to be compatible with the operating system the defendant made for its smartphones. Therefore, the defendant is able to prohibit the purchasers of its smartphones from buying the applications from anyone other than itself.

4. From the launching of its first smartphone product, the defendant has engaged in an scheme to control the market for its smartphones' applications in order to obtain monopoly profits from the distribution of these applications worldwide.

5. In order to profit off of this aftermarket monopoly, the defendant charges a 30% fee for any product not of its own making for sale in its applications store. This fee constitutes the supra-competitive prices for applications that the defendant enjoys as a result of its anticompetitive prices.

6. Plaintiff and the Class paid supra-competitive prices for the apps sold in defendant's online store and accordingly suffered an injury in fact and seek compensatory damages, an injunction against the unlawful practices, and other relief,

7. The Plaintiff and the Class seek to enjoin such fraud, obtain damages on behalf of the Class, and obtain an injunction against further such conduct in the District of Columbia.

2

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action, and venue is appropriate in this Court, pursuant to D.C. Code §§ 11-921 and 28-3905(k)(1).

9. This Court has personal jurisdiction over the Defendant pursuant to D.C. Code § 13-423, as Defendant sells its products at stores throughout Washington, D.C.

10. In addition, the purchase of the product at issue took place in this jurisdiction.

## THE PARTIES

11. Plaintiff Keven Fahey is a resident of Virginia.

12. On December 30 3017, Mr. Fahey purchased an Iphone 7 in Washington DC from a Maurice Brunson for $200, as is shown in the below receipt:



13.     On July 12th 2019, Mr. Fahey purchased a "Minecraft" app for his iPhone 7, at the Apple

Store on Wisconsin Avenue in Washington DC.  Set forth below is the receipt:

4



# Receipt

APPLE ID
akevinfahey@gmail.com

DATE
Jul 11, 2019

ORDER ID
MQDY7VMN7Z

DOCUMENT NO.
173278359747

BILLED TO
Visa .... 5928
Kevin Fahey
5303 Birds View Lane
Unit D
Alexandria, VA 22312-3901
USA

| App Store | | PRICE |
|---|---|---|
| **Minecraft**<br>Mojang<br>iOS App<br>Wilcox's iPhone<br>Write a Review | Report a Problem | $6.99 |

| | TOTAL | $6.99 |
|---|---|---|



## Send money with a message.

Use Apple Pay to send and receive money. It's as simple as sending a text.



14.     The Defendant is Apple Inc, located at 1 Apple Park Way, Cupertino, CA 95014

### Summary of Material Facts

15.     With great fanfare, Apple launched its first iPhone, called the iPhone 2G, on June 29, 2007.

Prior to and after its launch, Apple hailed the iPhone as a revolutionary "breakthrough"

"Smartphone" that functioned like a mobile computer with desk top class email and other

Internet communications capability.  Apple built the iPhone's operating system known as "iOS"

to browse the Internet, transform music into cell phone ringtones, take photos, play games and

5

engage in other functions typically performed on desktop or laptop computers.

16. Unbeknownst to iPhone consumers, however, from the time it launched the iPhone through the present date, Apple has engaged in an anticompetitive scheme to monopolize the aftermarket for iPhone applications in order to control and derive supra-competitive profits from the distribution of iPhone apps worldwide. As a result of its scheme, Apple has, from introduction of the iPhone 2G in 2007 through the present, cornered 100% of the worldwide distribution market for iPhone applications.

17. Apple has succeeded in totally eliminating any and all competition in that multi- billion dollar market. Apple's App Store is the only store in the entire world – online or off-line – where the tens of millions of U.S.-based iPhone owners (and the many tens of millions of iPhone owners worldwide) can buy an iPhone app, and Apple's unlawful monopolization of the apps market has enabled Apple to charge and collect a supra-competitive 30% fee from iPhone consumers for each and every one of the billions of iPhone apps they have bought since the iPhone's launch six years ago. Consequently, iPhone consumers nationwide have paid hundreds of millions of dollars more for iPhone apps than they would have paid in a competitive market.

18. Unlike traditional desktop or laptop computer manufacturers, whose computers' operating systems allow consumers to buy software applications from any and all competing software distributors, Apple's iOS system prohibits iPhone consumers from buying software applications from anyone other than Apple.

19. Even Apple's own iMac and MacBook desktop and laptop computers' operating systems – from which the iPhone's iOS operating system was derived – allow consumers to buy software from whatever source they like, and to pay the software manufacturer or distributor directly without having to pay an additional fee to Apple. There is no legitimate basis for Apple to treat

6

its iPhone customers any differently than it treats its iMac or MacBook customers, or to charge its iPhone customers a 30% mark-up for any and all software they buy for their iPhones owners worldwide) can buy an iPhone app, and Apple's unlawful monopolization of the apps market has enabled Apple to charge and collect a supra-competitive 30% fee from iPhone consumers for each and every one of the billions of iPhone apps they have bought since the iPhone's launch six years ago. Consequently, iPhone consumers nationwide have paid hundreds of millions of dollars more for iPhone apps than they would have paid in a competitive market.

20.     Unlike traditional desktop or laptop computer manufacturers, whose computers' operating systems allow consumers to buy software applications from any and all competing software distributors, Apple's iOS system prohibits iPhone consumers from buying software applications from anyone other than Apple.

21.     Even Apple's own iMac and MacBook desktop and laptop computers' operating systems – from which the iPhone's iOS operating system was derived – allow consumers to buy software from whatever source they like, and to pay the software manufacturer or distributor directly without having to pay an additional fee to Apple. There is no legitimate basis for Apple to treat its iPhone customers any differently than it treats its iMac or MacBook customers, or to charge its iPhone customers a 30% mark-up for any and all software they buy for their iPhones.

22.     But when Apple developed its unique iPhone, Apple took advantage of the heavy demand for its novel product to equip it with an operating system that foreclosed iPhone consumers from buying software from any source other than Apple, and Apple then forced those foreclosed consumers to pay Apple a 30% fee for each and every iPhone app they buy. Stated in antitrust terminology, Apple improperly exploited its relationships with customers who purchased Apple's highly desirable and expensive iPhone by locking them in, without their knowledge or

7

consent, into an aftermarket for iPhone apps that was monopolized by Apple.

23.     Apple's motive for its anticompetitive conduct was simple: Apple did not want its iPhone-related revenue stream to end when a consumer bought an iPhone, like it generally does when consumers purchase iMac and MacBook computers. So, Apple concocted and maintained a plan to continue generating additional revenues over the entire useful life of every iPhone it sold by cornering the distribution market for iPhone applications and charging consumers an extra 30% for every app. Through this scheme Apple would profit not only from the sales of tens of millions of iPhones, it would also profit from each and every one of the billions of future apps sales made to Apple's iPhone customers.

24.     Apple's anticompetitive scheme has generated enormous supra-competitive profits for Apple. Apple now offers more than 850,000 apps, and iPhone consumers worldwide have downloaded apps more than 50 billion times since July 2008. While the majority of iPhone apps are now free, United States iPhone consumers have been overcharged hundreds of millions of dollars for paid apps during the Class Period as a result of Apple's anticompetitive conduct.

25.     That Apple has engaged in unlawful monopolistic behavior with respect to iPhone apps is perfectly consistent with Apple's attitude towards antitrust compliance generally. A federal district court judge who observed Apple's attitude towards antitrust compliance during a recent trial found that Apple had unlawfully fixed e-book prices and concluded that Apple as an institution simply "does not want to engage in retail price competition" – indeed, "one of its principal goals was the elimination of all retail price competition," and "it was happy if a result of that ... was an increases in prices" that "the consumer had to pay."[1]

---

[1] Hearing Transcript ("Hr'g Tr.") at 11:4-5, 33:10-13, U. S. v. Apple Inc., No. 12 Civ. 2826 (S.D.N.Y. Aug. 27, 2013).

**26.** That district court further stated that "[t]he record at trial demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," (Hr'g Tr. 17:1-2) even among "Apple lawyers and its highest executives," (id. at 17:5-6) and concluded that an injunction was needed to ensure that a "comprehensive and effective" (id. at 19:18) antitrust compliance training program would be undertaken by "each of Apple's officers and directors engaged in whole or in part in activities relating to the supply of content," including "apps" (id. at 13:18-20). "Neither Mr. [Eddy] Cue," the Apple executive responsible for Apple's App Store, nor "his assigned in- house counsel, could remember [having] any training on antitrust issues," and "[t]hey and those on their teams need to understand what the law requires and how to conform their business practices to the law."[2]

**27.** Apple's unlawful monopolization of the iPhone applications aftermarket from July 2007 through the present is a direct reflection of Apple's goal of "eliminating all retail price competition" and its culture of disdaining antitrust compliance in order to increase the prices its customers pay. Through its actions, Apple has unlawfully stifled competition by erecting impenetrable barriers to entry to would-be distributors of iPhone apps, reduced consumer choice in what would otherwise be a robust and competitive iPhone software applications marketplace, and artificially increased prices for iPhone software applications to supra-competitive levels.

**28.** Apple's illegal iPhone apps monopoly should be enjoined and dismantled, and Plaintiff and the tens of millions of nationwide iPhone consumers they seek to represent should be reimbursed by Apple for the hundreds of millions of dollars they have been overcharged.

**SUMMARY OF CLAIMS**

---

[2] Hr'g Tr. at 18:11-13.

9

**29.**     In pursuit and furtherance of its unlawful anticompetitive activities, Apple: (a) failed to obtain iPhone consumers' contractual consent to Apple's monopolization of the iPhone applications aftermarket, the effect of which was to lock consumers into buying apps only from Apple and paying Apple's 30% fee, even if they wished to buy apps elsewhere or pay less; and (b) failed to obtain iPhone consumers' contractual consent to having their iPhones "locked" to prohibit them from using any app that was not approved or sold by Apple, thereby preventing iPhone purchasers from downloading and using other apps, called "Third Party App."

**30.**     Apple violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the software applications aftermarket for iPhones in a manner that harmed competition and injured iPhone apps consumers by reducing output and consumer choice, and by increasing prices for iPhone apps to supra-competitive levels.

**31.**     Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiff seeks an order restraining Apple from selling iPhones that are programmed in any way to prevent or hinder consumers from downloading Third Party Apps, or minimally, restraining Apple from selling or distributing iPhones without first obtaining the consumers' express contractual consent to (a) buying apps only from Apple and (b) having their iPhones locked to accept only apps purchased from Apple.

**THE PARTIES**

**32.**     Plaintiff Kevin Fahey is a resident of Virginia.

**33.**     Defendant Apple is a California corporation with its principal place of business located at Infinite Loop, Cupertino, California   95014.

**34.**     On December 30, 2017. Mr. Fahey purchased a used Iphone 7 from a Maurice Brunson for $220. Exhibit A.

10

**35.** On July 11, 2019, Mr. Fahey purchased a Mojang Minecraft IOS App for $6.99 from the Apple Store on Wisconsin Avenue, NW, Washington DC. Exhibit B

**36.** The Mojang IOS App is one of the products subject to Apple's anticompetitive "commission" as is described in more detail below.

## FACTUAL ALLEGATIONS

Apple's Anti-competitive Conduct

**37.** In Spring 2007, Apple began a massive advertising campaign to market its new wireless communication device, the iPhone. The iPhone was advertised as a combined mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability. The iPhone was, in effect, the world's first mobile computer. The iPhone shifted the paradigm for smartphones, and it changed the entire cell phone manufacturing industry

**38.** Having designed and manufactured a highly advanced and desirable new product, Apple profited handsomely from selling its revolutionary new handset. The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag, consumers waited in line to get their hands on one. [3] Apple has rightfully earned billions of dollars in revenue from selling its iPhones.

**39.** But Apple wanted more. It did not want to limit its revenues to what consumers were willing to pay for the iPhone itself. Apple wanted a substantial piece of every dollar that would ever be paid to buy any kind of software for the iPhone at any time anywhere in the world.

---

[3] Initially, the 4GB iPhone 2G retailed for $499 and the 8GB iPhone 2G retailed for $599. Apple has since released five other iPhone models, the iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S and iPhone 5, and it is expected shortly to release its new iPhone 5S. Currently, Apple sells 16GB, 32GB and 64GB versions of the iPhone 5, which range in price from $199 to $849, unless they are purchased as part of a handset-subsidized voice and data service plan offered by a cell phone service provider such as Verizon, Sprint, T-Mobile or AT&T Mobility.

11

**40.** To achieve that end, Apple embarked on a scheme to monopolize the aftermarket for iPhone applications and to foreclose and protect Apple against any and all competition it might face in the distribution of iPhone applications. In contrast to the robust competition Apple faces in the software aftermarket for its desktop and laptop computers, Apple wanted the entire iPhone software aftermarket for itself. Apple achieved its unlawful goal, through a series of actions.

**41.** Apple at all times retained exclusive control over the design, features and operating software for the iPhone, known as iOS, which is based on the same technologies that are used in Apple's desktop and laptop computers' operating systems, known as OS X. Although Apple has always maintained OS X as an "open" system that allows iMac and MacBook consumers to run software manufactured or sold by any distributor, Apple modified its iOS version to be a "closed" system by installing "security measures" or "program locks" designed to prevent iPhone consumers from installing and running apps that were not sold or approved by Apple.

**42.** Apple did not close the iOS system for the purpose of protecting its proprietary right to own, sell or license iOS. Apple closed the iOS system for the specific purpose, and with the specific intent, of foreclosing competition from other potential iPhone software manufacturers and distributors so that Apple could monopolize and derive monopoly profits from the iPhone apps aftermarket.

**43.** After Apple launched its iPhone 2G in June 2007, Apple enhanced its iPhone-related revenues either by developing its own apps for ringtones, instant messaging, Internet access, gaming, entertainment, video and photography or by enabling "approved" third party manufacturers to develop iPhone apps. Apple always conditioned its "approval" of such apps on the third party's agreement to give Apple a share of the third party's sales proceeds.

**44.** However, because Apple's OS X and iOS operating systems were based on the widely

available Unix platform and included technologies and services that were based on other open software systems, Apple's initial program locks designed to eliminate Third Party Apps proved ineffective, as clever third-party programmers quickly circumvented Apple's security measures and made non-Apple approved iPhone apps available for sale on the Internet.

**45.** Almost immediately after the iPhone's launch unapproved Third Party Apps started to appear and threatened to compete with Apple in the iPhone apps aftermarket. For example, Mobile Chat and FlickIM gave iPhone users access to instant messaging programs from which Apple derived no revenues. Apple responded to these threats by updating its iOS to eliminate iPhone consumers' ability to use these Third Party Apps and by warning its iPhone customers that using Third Party Apps would nullify Apple's iPhone warranty.

**46.** Apple also faced threatened competition for IPhone ringtones. When a customer purchased a song for $1 from the Apple iTunes store, Apple charged the customer an additional 99 cents to convert any portion of that song into a ringtone. A number of competing programmers promptly offered a variety of ringtone programs that enable Iphone consumer to download both sings and ringtones for free. Some of these programs allowed customers to use samples of popular songs lawfully downloaded from Apple's iTunes store as a ringtone. Other programs, such as I-Toner from Ambrosia Software and iPhone RingToneMaker from Efiko software, allowed customers to "clip" portions of songs purchased by them from iTunes for use as ringtones.

**47.** Since many of these programs used songs downloaded from iTunes, Apple initially sought to block the use of those songs as ringtones by updating the iTunes software to install program locks that would interfere with such use. However, those efforts were all quickly defeated by third party programmers, sometimes within hours of the release of the update. So Apple again

13

responded to these threats by updating its iOS to eliminate iPhone consumers' ability to use these Third Party Apps and by voiding the warranties of iPhone customers who used them.

48. Ultimately, Apple eliminated the threat of competition from unapproved apps developers by conceiving and implementing the App Store in order to become the exclusive distributor of iPhone apps, and by thereafter rigorously enforcing and maintaining its monopoly.

49. Apple laid the groundwork for its App Store in March 2008, when Apple released a "software development kit" ("SDK") for the stated purpose of enabling independent software developers to design applications for use on the iPhone. For an annual fee of $99, the SDK allows developers to supply apps to Apple for distribution through Apple's App Store.

50. Apple opened its App Store in July 2008. Apple owns 100% of the App Store, staffs the App Store with Apple employees or agents, and controls all of the App Store sales, revenue collections and other business operations.

51. Apple informs its prospective apps developers (though not its iPhone consumers) that the developers' apps cannot be sold anywhere except in the App Store. Apple also informs its developers (but not its iPhone customers) that Apple will charge iPhone consumers a 30% commission for any non-free app sold in the App Store.

52. Consequently, the prices for apps available in Apple's App Store include the developers' price plus Apple's 30% mark-up. When an iPhone customer buys an app from Apple, it pays the full purchase price, including Apple's 30% commission, directly to Apple. Apple takes its 30% commission off the top and then remits the balance, or 70% of the purchase price, to the developer. Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale. The developers at no time directly sell the apps or licenses to iPhone customers or collect payments

14

from the customers.

53.     On information and belief, throughout the Class Period, Apple threatened to terminate any
        developer that made its apps available on its own website or through a distributor other than
        Apple, and Apple continued to discourage iPhone customers from downloading Third Party
        Apps by telling customers that Apple would void and refuse to honor the iPhone warranty of
        any customer who downloaded a Third Party App.

54.     By designing the iPhone iOS as a closed system, installing security measures and program
        locks to prevent Third Party App downloads, establishing the App Store as the exclusive
        worldwide distributor of iPhone apps, and enforcing the App Store's exclusive distributor status
        by terminating apps developers who sold apps in competition with Apple and voiding the
        warranties of iPhone consumers who bought competing apps, Apple has since June 2007
        willfully acquired and maintained a monopoly in the iPhone apps aftermarket and has
        positioned itself as the one and only distributor of iPhone apps on the entire planet. Apple has
        no competition in the multi-billion dollar iPhone apps aftermarket, and has positioned itself as
        the only and only distributor of iPhone apps on the entire planet.   Apple has no competition in
        the multi billion dollar iPhone apps aftermarket, domestically or abroad, whatsoever.

55.     Prior to the Class members' purchases of their iPhones, Apple had not even disclosed –
        much less obtained the Class Members  contractual consent to – either (a) Apple's
        monopolization of and collection of monopoly profits from the iPhone applications aftermarket,
        or (b) having their iPhones locked to prohibit the Class Members from using any app that was
        not approved or sold by Apple. Absent obtaining the Class Members' contractual consent,
        Apple's monopolization of the iPhone applications aftermarket constitutes an antitrust violation
        under Section 2 of the Sherman Act.

**PLAINTIFFS' INJURIES**

**56.** Plaintiff has been injured by Apple's anticompetitive conduct because they paid more for their iPhone apps than they would have paid in a competitive market. The Plaintiff has also been injured because Apple's unlawful monopolization of the iPhone apps aftermarket has extinguished Plaintiff and the Class Members freedom of choosing between Apple's App Store and lower cost market alternatives that would have been available had Apple not monopolized the market. Plaintiff has also been injured because Apple's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of iPhone apps, which would have been more abundantly available in a competitive market.

**57.** That Plaintiff and the Class Members have paid supra-competitive prices is obvious for several reasons. Under basic and fundamental economic principles, the absence of competition leads to increased prices, and increased competition leads to lower prices. In a competitive market, an economically rational manufacturer or distributor will sell its products at prices equal to their cost plus a reasonable marginal rate of return (profit) dictated by the market environment. But an economically rational monopolist that is unconstrained by the downward pricing pressures of a competitive market will charge the highest price it can in light of the demand for its products; the greater the demand, the higher the profits. Indeed, it is hornbook economics that commercial entities strive to acquire and maintain monopoly power precisely because they want to reap the monopoly profits that market domination typically generates.'

**58.** Apple and the iPhone apps aftermarket are not immune from these presumptively valid economic principles. Indeed, as shown above, the generation of monopoly profits was exactly why Apple chose to monopolize the iPhone apps aftermarket.

**59.** That Apple's 30% fee is a monopoly price is also obvious from Apple's cost structure. Each

developer's $99 annual fee covers most or all of Apple's costs of reviewing that developer's apps and the related proportional costs of operating and maintaining the App Store, even if the developer submits several apps annually. As to successive sales of that developer's apps, therefore, Apple's 30% fee constitutes virtually pure profit for Apple. In a competitive environment, where developers could sell their apps on their own websites without charging Apple's 30% mark-up and discount retailers could obtain volume discounts and sell for far less than a 30% profit, Apple would be under considerable pressure to substantially lower its 30% profit margin because, otherwise, its App Store would be priced out of the market and lose substantial market share. In a truly competitive iPhone apps distribution environment, Apple's 30% margin would be simply unsustainable.

60.     A truly competitive iPhone apps distribution market would also give Plaintiff and the Class Members the freedom to choose between Apple's high-priced App Store and less costly alternatives, such as buying direct from apps developers or volume-driven and other software discounters  The freedom of Plaintiff and the Class members to choose between these market alternatives has been eliminated by Apple's monopolistic conduct, and the Plaintiff and the Class Members have been forced to pay supra-competitive prices to Apple as a result.

61.     The lack of a truly competitive environment has also led to reduced output and supply of iPhone apps because developers are barred from selling apps at prices below Apple's inflated 30% marked-up price. Under basic economic principles, lower prices would generate both increased demand and increased supply to meet that demand in the iPhone apps aftermarket as a whole. Apple's unlawful monopoly naturally restricts both supply and demand.

Injury to Competition

17

**62.**     The same conditions – the existence of supra-competitive pricing, reduced consumer choice among market alternatives, and reduced output and supply – demonstrate that Apple's monopolistic conduct has likewise injured competition generally in the iPhone apps aftermarket.

**63.**     The iPhone apps market is not remotely like the genuinely competitive personal computer software market, where computer hardware manufacturers – including Apple itself – do not control or have a financial stake in every sale of software that is downloaded on the computers they make. In the aftermarkets for desktop and laptop computer software, the software developers can offer products directly to consumers or through discounters without having to gain the computer manufacturer's approval and without the software customers paying the manufacturer a penny. Consequently, there is an abundant supply of competing software applications, and consumers can shop among multiple vendors without paying above market prices.

**64.**     The iPhone apps market lacks all of these indicia of competitiveness. Because Apple has unlawfully cornered the nationwide (and, indeed, worldwide) distribution market for iPhone apps, the iPhone apps aftermarket has been harmed generally by Apple's anticompetitive conduct, which is precisely the type of harm the antitrust laws were enacted to remedy)

**RELEVANT MARKET ALLEGATIONS**

**65.**     The iPhone is a unique, premium-priced product that generates a unique aftermarket for software applications that can be used only on iPhones. During at least the Class Period, the price of iPhones was not responsive to an increase in iPhone application prices because Apple did not obtain iPhone customers' knowledgeable contractual consent to Apple's monopolization of and monopoly pricing in the apps aftermarket. Consequently,

(a) consumers who purchased iPhones could not, at the point of sale, reasonably or accurately

inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime); and

(b) consumers were "locked into" the iPhone due to its high price tag and would incur significant costs to switch to another handset. The aftermarket for iPhone applications is thus an economically distinct product market, and the applications that are distributed within that market have no acceptable substitutes.

66.     The existence of competition in the smartphone market between Apple's iPhone and the

makers of competing handsets such as Google's Android phones is irrelevant to the relevant

market analysis in a Section 2 Sherman Act aftermarket monopolization case, in which the

existence or lack of competition in the aftermarket at issue is the only economically meaningful

inquiry. The existence of Android phone applications and applications geared toward other

smartphone brands is likewise irrelevant because those applications are technologically

incompatible with the iPhone and, therefore, are not reasonably interchangeable substitutes for

iPhone apps. Even if those other smartphone apps were technologically compatible, Apple's

exclusionary and monopolistic conduct would bar such apps from being sold in competition

with Apple for the same reasons and in the same manner that Apple has foreclosed such

competition for iPhone Third Party Apps generally.

67.     The geographic scope of the iPhone applications aftermarket is national.

68.     The aftermarket for iPhone applications includes the market for distributing software

applications that can be downloaded on the iPhone for managing such functions as ringtones,

instant messaging, photographic and video capability, gaming and other entertainment, Internet

applications, and any other downloadable software-driven functions.

69.     The applications aftermarket came into existence immediately upon the sale of the first

iPhones because: (a) the applications aftermarket is derivative of the iPhone; and (b) no Plaintiff

or member of the Class agreed to any restrictions on their ability to access a competitive iPhone

applications aftermarket.

**CLASS ALLEGATIONS**

**70.** **Class definition**. All persons, exclusive of Apple's employees agents and affiliates and the

Courts and its employees who purchased in the District of Columbia an iPhone application or

application licenses from Apple for use on an IPhone at any time from December 29 2007

throughout the date of any judgment or final settlement in this action.

**71.** This action has been brought and may be maintained as a class action pursuant to Superior

Court Rule of Civil Procedure 23 because there is a well-defined community of interest among

the persons who comprise the readily ascertainable classes defined below and because Plaintiff

is unaware of any difficulties likely to be encountered in managing this case as a class action.

**72.** **Relevant Time Period:** Set forth in the Class Definition, above.

**73.** Excluded from the class are:(1) the Defendants, their subsidiaries, and their legal

representatives, officers, directors, assigns and successors; and (2) all state and/or federal court

judges who may preside over this case, their staff, and their immediate family members.

**74.** Numerosity:        The class members are so numerous that the individuals joinder of each

individual class member is impractical. While Plaintiff does not currently know the exact

number of class members, Plaintiff is informed and believes, and thereupon alleges that the

actual number exceeds the minimum required for numerosity under DC law.

**75.** Commonality and Predominance: Common questions of law and fact exist as to all class

members and predominate over any questions which affect only individual class members.

**76.** These common questions include, but are not limited to:

(a) Whether Defendants contributed to, committed, or are responsible for the conduct

alleged herein;

20

(b) Whether Defendants' conduct constitutes the violations of law alleged herein;

(c) Whether Defendants' acted willfully, recklessly, negligently, or with gross negligence in the violations of laws alleged herein;

(d). Whether Class Members are entitled to injunctive relief;

(e). Whether Class Members are entitled to restitution and damages; and

(f) Whether the Defendants' conduct violated the various statutes and common law causes of action sets forth *infra* and whether Plaintiff and the Class Members are entitled to relief, and the amount and nature of such relief in the form of an injunction and /or restitution.

## Count 1
### Unlawful Monopolization of the Applications Aftermarket
### In Violation of Section 2 of the Sherman Act
### (Seeking Damages and Equitable Relief)

77.   Plaintiff incorporates the allegations of paragraphs 1 through 78 as though fully set forth herein, and alleges further:

78.   Apple has acquired monopoly power in the iPhone applications aftermarket through unlawful, willful acquisition and maintenance of that power. Specifically Apple has unlawfully acquired monopoly power by: (a) designing the iPhone iOS as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iPhone apps; and (c) enforcing the App Store's monopoly status by terminating or threatening to terminate apps developers who sell apps in competition with Apple and by voiding the warranties of iPhone consumers who buy competing apps.

79.   Apple's unlawful acquisition of monopoly power has reduced output and competition and resulted in increased, supra-competitive prices for products sold in the iPhone applications

21

aftermarket and, thus, harms competition generally in that market.

**80.** Plaintiff has been injured in fact by Apple's unlawful monopolization because they have been: (a) deprived of lower cost alternatives for apps; (b) forced to pay supra-competitive prices for apps; and/or (c) subjected to a lower output and supply of apps.

**Count II**
**Attempted Monopolization of the Application After Market**
**In Violation of the Sherman Act –**
**Seeking Damages and Equitable Relief**

**81.** Plaintiff incorporate the allegations of paragraphs 1 through 78 as though fully set forth herein, and alleges further:

**82.** Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone applications aftermarket. Specifically, Apple has attempted unlawfully to acquire monopoly power by: (a) designing the iPhone iOS as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iPhone apps; and (c) enforcing the App Store's unlawfully acquired market position by terminating or threatening to terminate apps developers who sell apps in competition with Apple and by voiding the warranties of iPhone consumers who buy competing apps.

**83.** Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the applications aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

22

**84.** Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased, supra-competitive prices for products sold in the iPhone applications aftermarket and, thus, harms competition generally in that market.

**85.** Plaintiff and the Classd Members have been injured in fact by Apple's attempted monopolization because they have been: (a) deprived of lower cost alternatives for apps; (b) forced to pay supra-competitive prices for apps; and/or (c) subjected to a lower output and supply of apps.

**86.** Apple's attempted monopolization of the iPhone applications aftermarket violates Section 2 of the Sherman Act, and its anticompetitive practices are continuing and will continue unless they are permanently enjoined. Plaintiff and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

**Count III**
**District of Columbia Antitrust Act**
**§ 28–4502 et seq.**
**Unlawful Monopolization of the Applications Aftermarket**

**87.** Plaintiff incorporates the allegations of paragraphs 1 through 78 as though fully set forth herein, and alleges further

**88.** The allegations in paragraphs 78 to **Error! Reference source not found.** are herein incorporated by reference.

**Count IV**
**District of Columbia Antitrust Act**
**§ 28–4502 et seq.**
**Unlawful Monopolization of the Applications Aftermarket**

**89.**    Plaintiff incorporates the allegations of paragraphs 1 through 80 as though fully set forth

herein, and alleges further

**90.**    The allegations in paragraphs 82 to 84 are herein incorporated by reference.

**Count V –**
**Violations of the District of Columbia Consumer Protection Act**
**§3904**

**91.** Plaintiff incorporate the allegations of paragraphs 1 through 80 as though fully set forth

herein, and alleges further:

**92.**  By marketing the Product in the manner described above, the Defendant violated the

various provisions of Section 3904 of the CPPA.

**93.**    Such violations are actionable under the CPPA, and make the relief requested below

appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, as to Counts I- V of the Complaint, Plaintiff, on behalf of the general public of

the District of Columbia, asks this court to award

a.  Permanently enjoining Apple from monopolizing or attempting to monopolize the iPhone

applications aftermarket or, minimally, restraining Apple from selling or distributing iPhones

without first obtaining the consumers' express contractual consent to (1) Apple's

monopolization of and charging of monopoly prices in the iPhone apps aftermarket,(2_ and

having their iPhones locked to accept only apps or purchased from Apple;

b.  Awarding Plaintiffs and the Class treble damages for injuries caused by Apple's violations of

the federal antitrust laws;

c.  Awarding Plaintiff and the Class reasonable attorneys' fees and costs; and

d.  Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Respectfully Submitted

*Thomas C. Willcox*
Thomas C. Willcox, Attorney at Law
DC Bar No 445135
1701 16th Street, N.W
Suite 211
Washington DC   20009
Tel: 202.338.0818
T.C. 202.234.0892
thomaswillcox@willcoxlaw.com.com
Attorney for Plaintiff A. Kevin Fahey

25